**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION**

| | | |
|---|---|---|
| **BRIGHTPOINT, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:04-CV-2085-SEB-JPG** |
| **vs.** | ) | |
| | ) | |
| **ZURICH AMERICAN INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This is a dispute over insurance coverage.  Plaintiff, Brightpoint, Inc.
("Brightpoint"), is the insured under a Crime Policy issued by Zurich American
Insurance Company ("Zurich"), the Defendant.  Brightpoint claims that it is
entitled to coverage for a loss of nearly a million and a half dollars that one of
its subsidiaries occasioned in the Philippines as a result of a scam involving
prepaid telephone cards.  Zurich has denied coverage.  Each side has filed a
motion seeking summary judgment.

**I.     Summary Judgment Standard**

Summary judgment is to be granted "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).
In determining summary judgment, the court views all evidence and draws
reasonable inferences in the light most favorable to the non-moving party.
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51 (1986).  The scope of
coverage provided by an insurance policy, however, is a question of law
particularly appropriate for resolution at the summary judgment stage since
factual disputes, if any, are ordinarily limited to the amount of loss for which
an insurer may be liable.  *See Duane Reade, Inc. v. St. Paul Fire and Marine Ins.
Co.*, 411 F.3d 384, 389 (2nd Cir. 2005)*;  National Fire and Casualty Co. v. West
by and Through Norris*, 107 F.3d 531, 534-535 (7th Cir. 1997); *Hurst-Rosche
Engineers, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995).

## II.    Factual Background

The coverage provision which Brightpoint seeks to invoke is referred to
by the Zurich policy on the declarations page as "Form F - Computer
Fraud/Wire Transfer."  Form F is  relatively short and the relevant provisions
are set out below:

> A.    COVERAGE
>
> We will pay for loss of, and loss from damage to, Covered
> Property RESULTING DIRECTLY FROM THE Covered
> Cause of Loss.
>
> 1.  Covered Property: "Money", "Securities" and "Property
> Other Than Money and Securities".
>
> 2.  Covered Cause of Loss: "Computer Fraud".

-2-

B.    LIMIT OF INSURANCE

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the DECLARATIONS.

C.    DEDUCTIBLE

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount in the DECLARATIONS.  ... .

D.    ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS

In addition to the provisions in the Crime General Provisions, this Coverage Form is subject to the following:

1.    ... .

2.    ... .

3.    Additional Definitions

    a.    "Banking Premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

    b.    "Computer Fraud" means "theft" of property following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the . . premises" or "banking premises" to a person (other than a "messenger") outside those "premises" or to a place outside those "premises".  The means by which a fraudulent transfer is initiated includes: written, telephonic, telegraphic, telefacsimile, electronic, cable, or teletype instructions.

    c.    ... .

    d.    "Occurrence" means an:

        (1)    Act or series of related acts or events not involving any person; or

        (2)    Act or event, or a series of related acts or events not involving any person.

-3-

e.      "Premises" means the interior of that portion of any building you occupy in conducting your business.

f.      "Theft" means any act of stealing.

Brightpoint operates a subsidiary in the Philippines.  There is no issue with respect to the subsidiary being an insured under the policy and for simplicity's sake we will simply refer to the subsidiary as Brightpoint.  In addition to selling mobile phone units, part of Brightpoint's business in the Philippines is the wholesale distribution of prepaid mobile telephone cards. The prepaid phone cards come to Brightpoint  from a telecom company with each card having a certain Philippine Pesos worth of mobile phone calling time allotted to it.  The holder of such a card  loads the value of the prepaid phone card onto a mobile phone "SIM card," and can then make mobile phone calls until all of the value of the prepaid phone card is depleted.

Enrico Genato ("Genato"), who does  business in the Philippines as RGG Communication Enterprise, is a dealer to whom Brightpoint sold phone cards. Because of the large volume of his purchases, Brightpoint usually accepted payment from Genato by a post-dated check.  In addition to the post-dated checks, Brightpoint required Genato to provide bank guaranties, which certified the sufficiency of funds in Genato's account and committed to honoring the post-dated checks when Brightpoint presented them on their maturity dates.  These bank guaranties were issued by Equitable Savings Bank

-4-

("Equitable") through its branch manager, Ellen Cachola.  Genato normally
sent copies of the post-dated checks and guaranties, as well as the purchase
orders for the phone cards, by facsimile to Brightpoint.  Brightpoint would then
purchase the phone cards from the appropriate telecom company and deliver
them to Genato or his representative in exchange for the original checks,
guaranties and purchase order.

On both January 23 and 24, 2003, by facsimile, Brightpoint received
copies of  purchase orders, post-dated checks, and bank guaranties believed to
be from or authorized by Genato.  The January 23 order was for 200,000
cards.  The January 24 order was originally for 150,000 cards, but was later
reduced to 100,000 cards because Brightpoint  could only service an order for
100,000 cards.  After Brightpoint received these faxed documents on both
January 23 and 24, 2003, it sent an employee, Jay-Jay N. Moralde , to the
main office of Globe Telecom ("Globe"), the company from which Brightpoint
purchased the cards to be distributed to Genato.  On each of these occasions,
Moralde went to Globe's office where he purchased and received possession of
the phone cards.  At a location just outside Globe's building,  and after receipt
of  the originals of the  post-dated checks and bank guaranties that had earlier
been faxed to Brightpoint, Moralde turned over the phone cards he had

purchased from Globe.[1]  The exchange was made with Reena Aldeguer, a person who had attended other similar exchanges and who was believed to be a representative of Genato.

On January 30, 2003, Genato called Brightpoint's sales manager, Gladys Aldiosa , to request a meeting.  At that meeting, which took place on January 31, 2003, Genato denied issuing the January 23 and 24 purchase orders, denied authorizing Aldeguer to pick up the phone cards, and denied authorizing Equitable or Cachola to issue the bank guaranties.  This took Brightpoint completely by surprise.  Ultimately, Brightpoint never received payment for the 300,000 phone cards that it delivered to Aldeguer.  The cards, which had a value of approximately 82,350,000 Philippine Pesos (or nearly $1.5 million - American) were never recovered.  Aldeguer has admitted that on January 23 and 24, 2003, she participated in the theft of the Globe prepaid phone cards from Brightpoint, but claims that Genato was a part of the scheme.  Genato denies any participation.   The incident is being investigated criminally by the Philippine federal police and Brighpoint has commenced a

---

[1]Though not particularly important, we note that it is unclear from the description of the facts, as set forth in various submitted affidavits, whether Moralde first obtained the original checks and guaranties from the purported representative of Genato and then went into Globe's building to purchase and bring back the phone cards or whether he obtained the phone cards prior to the exchange.  Either way, there does not appear to be a material distinction between the two versions.

civil action against Genato, Equitable and Aldeguer  in the Philippines to

recover its losses.

On April 11, 2003, Brightpoint notified Zurich of its loss due to the theft

of the prepaid phone cards.  At Zurich's  request, Brightpoint later submitted a

sworn "Claim of Loss" form detailing the circumstances of the loss and seeking

coverage under the Form F coverage provisions.  On October 16, 2003, Zurich

denied Brightpoint's claim, stating in part:

> It does not appear that the Proof of Loss demonstrates that
> Brightpoint has incurred a covered loss since there is insufficient
> documentation establishing a loss of or to "Covered Property"
> resulting directly from "Computer Fraud" as defined in Form F.
> The documents attached to the Proof of Loss may suggest that
> certified, postdated checks received by Brightpoint as payment for
> telephone cards were dishonored by the issuing bank.  However,
> there is nothing in the Proof of Loss that proves that a computer
> was used to fraudulently cause a transfer of the phone cards.  As
> such, Zurich cannot conclude that the Claimed Loss is a covered
> loss and is requesting further documentation in order to further
> evaluate coverage.

The letter also asserted a reservation of rights and defenses by Zurich

and set forth a  number of questions and requests for additional information to

Brightpoint.  Responses were provided by Brightpoint, but Zurich never agreed

that coverage existed.  Consequently, Brightpoint has filed this lawsuit.  One

jurisdiction is based upon diversity and both sides agree that Indiana law

applies.

### III.    Discussion

A federal court sitting in diversity applies state substantive law.  *See Mercado v. Ahmed*, 974 F.2d 863, 866 (7th Cir. 1992).  Under Indiana law, insurance contracts are examined under the same rules of construction as any other contracts.  *National Fire and Cas. Co. V. West by Norris,* 107 F.3d 531, 535 (7th Cir. 1997); *Indiana Farmers Mut. Ins. Co. v. Imel*, 817 N.E.2d 299, 302 (Ind. App. 2004).  When an insurance contract "is clear and unambiguous, the language therein must be given its plain meaning."  *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985).  If there is an ambiguity, then the ambiguous portion of the insurance contract must be viewed from the standpoint of the insured and strictly construed against the insurer.  *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000).  Such an ambiguity exists only if reasonable people could disagree about the meaning of the contract's terms.  *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002).  However, this does not mean that an ambiguity exists simply because an insured and an insurer may disagree about the meaning of a provision.  *Id.*

Zurich advances four reasons that Form F coverage does not attach to this loss.  First, it argues that Brightpoint did not "own" the phone cards at the time it received the facsimile transmission.  Second, it contends that the phone cards were never located in or transferred from Brightpoint's "premises."  It also maintains that the phone cards were not "covered property" under the

policy.  Finally, Zurich argues that the receipt of the facsimile transmission was not the cause of Brightpoint's loss.

Brightpoint contends that it is entitled to summary judgment because the loss falls squarely within the coverage provided by Form F.  The facsimiles it received (which it alleges constitutes the use of a computer) of the checks and bank guaranties caused it to take actions which eventually led to it being defrauded when it released the phone cards to the defrauding party.  It also maintains that Zurich may not now claim any basis for denying coverage that it did not put forth prior to Brightpoint filing suit.  Because we find merit in certain of Zurich's defenses to coverage, we will first address the issue of whether it is too late for Zurich to raise these defenses.

Brightpoint relies on the  "mend the hold" doctrine as a basis for asserting that Zurich is limited to those coverage defenses it asserted in its letter of October 16, 2003.  This doctrine prohibits a defendant in a contract action from asserting  grounds for its defense that are different from the grounds asserted prior to the filing of suit.[2]  *National Hame & Chain Co. v. Robertson,* 161 N.E. 851, 853 (Ind. App. 1928).  However, the doctrine has no

---

[2]"Mend the hold" is a nineteenth-century wrestling term, meaning to get a better grip or hold on an opponent.  *Harbor Ins. Co. v. Continental Bank corp.*, 922 F.2d 357, 362 (7th Cir. 1990).  In Indiana, the doctrine is intended to discourage breaches of contract and thus advance substantive state policy by prohibiting a contract defendant from adding defenses as the litigation unfolds.  *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1123 (7th Cir. 1998).

application here, where Zurich specifically stated in its October 16 letter that the contents of its letter to Brightpoint were not to be interpreted as a comprehensive response to the request for coverage and that all rights and defenses under the policy were reserved.  Indeed, while Zurich has added to its defenses in response to the lawsuit, it has also continued to assert the defenses it set forth in the letter as well.  The mend the hold doctrine does not apply here, so we move on to an examination of the four defenses to coverage which have been raised by Zurich.

Zurich's first defense to coverage is that the phone cards were not the property of Brightpoint at the time the relevant facsimiles  were received by Brightpoint.  In the body of the policy the "General Conditions" are listed which apply to all coverages.  Within those general conditions, the interests and property covered are defined as property: "a) [T]hat you own or hold; or b) [F]or which you are legally liable."  Brightpoint argues that the policy should not be read to require that the insured own the property at issue at the "instant" a fraudulent scheme begins.

Neither side has provided us with any case law directly on point.  While it is true that Brightpoint did not own the phone cards at the moment the scheme began, it is also true that it did own them by the time the cards were turned over to the defrauding party.  We therefore must determine whether an ambiguity exists in the policy with respect to the point in time at which the

stolen property must belong to the insured.  In resolving that issue, we concurr with Brightpoint.

The limitation of covered interests appears to be intended to assure that no coverage will attach to a loss of property that belongs to a third party. Included in the same provision within the general conditions section of the policy which requires that the insured, own, hold or be liable for the property, is the statement that the insurance is for the insured's  benefit only.  That statement is followed by:  "[I]t provides no rights or benefits to any other person or organization."  We believe this final provision expresses clearly the requirement that the property be owned or held by the insured as opposed to another party.  In the case at bar, there is no dispute over the fact that when the phone cards were turned over to Aldeguar they belonged to Brightpoint and not a third party.  Therefore, we believe that the ownership provision in the policy does not foreclose coverage for Brightpoint.

We also disagree with Zurich's assertion that the phone cards were not "Covered Property," as defined in the policy.  The insurer argues that the phone cards were not "Money", "Securities" or "Property Other than Money and Securities" which are the terms used to describe the type of property which is covered under Form F.  The only requirements for property to fall under the latter definition of "Property Other than Money and Securities" is that it be "tangible", have "intrinsic value" and not be money, securities or a property

specifically listed as not covered.  According to Zurich, the loss is purely the economic value of the phone cards and not the cards themselves and therefore the cards were not "tangible" property.

This defense strikes us as a bit contrived.  Nevertheless, Zurich cites to the holding in *People's Telephone Co., Inc. v. Hartford Fire Ins. Co.*, 36 F.Supp.2d 1335 (S.D.Fla. 1995) for finding that the telephone cards were not tangible property.  In *People's Telephone,* the property at issue was stolen by a People's employee and consisted of lists of combinations of electronic serial numbers and mobile phone identification numbers which were then used to program mobile phone "clones" that could be used with the corresponding charges going to People's account with its cellular phone provider.  *Id.* at 1336. People's sought coverage for the cellular charges and the deactivation and reactivation charges incurred in order to disconnect the stolen numbers and install new numbers on its cellular phone inventory.  *Id.*  Hartford denied coverage, claiming that the number combinations were not "tangible property" as defined in its policy, a policy with a nearly identical definition of "property other than money or securities" as the policy at issue here.  *Id.* at 1337.  In the subsequent coverage action in *Peoples Telephone* , the district court found that the number combinations were not tangible property, but more closely resembled proprietary information that could be used or disclosed to cause economic damage.  *Id.* at 1339.  It also opined that there was no real intrinsic

-12-

value to the list of numbers because they had no meaning or use without reference to the cellular phones. *Id.* Finally, the district court viewed the damages as fluid, another indicator that they were purely economic, where the amount of damages was dependent on how fast the phones were cloned and the illegal activity detected and corrected. *Id.* at 1341.

Obviously, a federal district court decision from Florida has no precedential value here, but does serve to inform our own judgments. That said, we do not regard the Florida opinion as particularly persuasive here. First, the court in *People's Telephone* was not applying the law of Indiana. Second, in the case at bar, the issues pertain to phone cards, each of which has a specific value assigned to it; the cards are tangible and can be physically transferred to another, carrying with them an ascribed, intrinsic value. *Black's Law Dictionary*, which both parties refer us to for other definitions in their briefs, defines "tangible property" as "property that has physical form and characteristics." *Black's Law Dictionary* 1254 (8th ed. 2004). "Intrinsic value" is defined by *Black's* as "the inherent value of a thing, without any special features that might alter its market value." *Black's Law Dictionary* 1587 (8th ed. 2004). While a cellular phone is engineered to extract the specific value from each prepaid telephone card, we do not regard that technological feature to

-13-

detract from the intrinsic monetary values assigned to the cards.[3]  The cards can be sold individually to a consumer who will derive the same value as the seller possessed - namely, the amount of call minutes that may be utilized on a mobile phone.

Zurich's next defense to coverage is based on the fact that the phone cards were not transferred from inside the "premises" or "banking premises," as required under the policy definition of "Computer Fraud."  Since "premises" is defined in Form F as being "the interior of that portion of any building you occupy in conducting your business," we have no problem reaching the same conclusion that Zurich did here.  The phone cards were never inside a building which Brightpoint occupied or where it conducted its business.

Brightpoint argues that the definition of "premises" should be interpreted broadly enough to include a location where a Brightpoint employee continues to advance the interests of the company by purchasing the phone cards which Brightpoint resells to dealers.  Again, Brightpoint offers as support the *Black's Law Dictionary* definition of "business" as "commercial activity engaged in for

---

[3]We also are not convinced by the analysis employed in *People's Telephone* in determining whether an item has intrinsic value.  The fact that the number combinations had no value apart from the cellular phones does not mean that the numbers did not have value in and of themselves. A bullet without a gun clearly still has intrinsic value, even though they are designed to work in tandem.

gain" and *Black's* definition of "occupy" as "to do business in."[4]  These definitions equip Brightpoint to argue that Moralde, its employee, occupied Globe's building because he  was conducting commercial activity for gain within it.  Therefore, it argues, Globe's office building constituted "premises" as defined in the policy.  We cannot adopt this rationale.

When interpreting insurance policies, Indiana courts are instructed to read the contract as a whole and construe the language so as not to render any words or phrases ineffective or meaningless.  *Allstate Ins. Co. v. Burns,* 837 N.E.2d 645, 651 (Ind. App. 2005).  The interpretations advanced by Brightpoint for  "occupy" and "business," when applied in the context of this insurance policy, unreasonably expand the definition of "premises" to include any building where a Brightpoint employee happens to be pursuing some interest of the company.  That interpretation could be construed to include literally any building anywhere a Brighpoint employee might find himself during business hours.  The limitation on coverage to property transferred out of Brightpoint's or a bank's premises would be made meaningless by the adoption of the broadly generic definition used by Brightpoint.  Consequently, we accept Zurich's defense to coverage in this respect.

_____

[4]Neither of these definitions appears in the 8th edition of *Black's.* " Occupy" is not defined at all.  "Business" is defined similarly to the quoted reference, but not identically, that is, "a commercial enterprise carried on for profit."  *Black's Law Dictionary* 211 (8th ed. 2004).

Similarly, we are convinced that the final defense advanced by the insurer has merit.  We do not view the faxed post-dated checks and bank guaranties to have "fraudulently cause[d] a transfer" of the phone cards, as required under the policy definition of "Computer Fraud."  By Brightpoint's own admission, the facsimile simply alerted the company to the fact that Genato, or perhaps in this case some other person mimicking his methods, wished to place an order.  Only after Brightpoint received the physical documents would they release the phone cards and, based on established practices of Brightpoint, the cards  would not have been turned over simply on the basis of the facsimile.  The fraud in this instance occurred through the use of the unauthorized checks and guaranties, not the manipulation of numbers or events through the use of a computer, facsimile machine or other similar device. The facsimile transmission caused Brightpoint to purchase the cards from its supplier, not to transfer them to its purchaser, and the use of the fax thus cannot be viewed as having directly or proximately caused the theft.

Brightpoint argues that the policy only requires that the theft follow and be directly related to the use of a computer.  It maintains that the policy language does not contain a modifier such as "proximate cause", "predominate cause" or the like.  In addition, according to Brightpoint, all that is required in terms of coverage is the use of a computer followed by a theft that is in some way connected to the use of the computer.  We think Brightpoint's expansive

interpretation of the term "directly related" represents a distortion of the policy terms.  Returning to *Black's Law Dictionary*, "directly" is defined as:  "[I]n a straight line or course" and "immediately."  *Blacks Law Dictionary* 492 (8th ed. 2004).  The loss to Brightpoint that occurred here did not flow immediately from the use of the facsimile.  Brightpoint's focus on individual words in the policy at the expense of the common and ordinary meaning of the policy language as a whole leaves us unconvinced.

Under Indiana law, a court required to engage in insurance policy interpretation must seek to enforce the intentions of the parties as manifested in the insurance contract.  *RMJ Enterprises, Inc. v. Scottsdale Ins. Co.*, 808 N.E.2d 159, 163 (Ind.App. 2004).  The policy, therefore,  must be considered as a whole and all language examined in context, not simply on the basis of isolated terms or phrases.  *Id.*  Words and phrases are to be given their ordinary meanings; likewise, the policy language as a whole.  Brightpoint's approach in isolating words and relying upon dictionary definitions of terms such as "following" and "directly related",  leads to bizarre constructions of the contract.  For example, applying this approach, Form F could be read to provide coverage where a customer sends an e-mail indicating that he is coming over to Brightpoint's offices to make a cash purchase of 50 mobile phone units and completes the transaction by using counterfeit money.  If coverage were permitted, it would reflect an interpretation other than a plain

and ordinary interpretation of the policy at issue; any reasonable person would not give the Form F provisions regarding coverage for computer fraud or wire transfer that "spin."  Obviously, in both the contrived example and in this case, intervening events or circumstances became the direct, proximate, predominate and immediate cause of Brightpoint's loss.[5]

## IV.    Conclusion

For the reasons discussed in this entry,  we hold that the policy of insurance issued by Zurich to Brightpoint does not provide coverage for the loss occasioned as a result of the fraudulent conversion of the pre-paid mobile phone cards.  Accordingly, Brightpoint's Motion for Summary Judgment (**Docket # 41**) is DENIED.  Zurich's Motion for Summary Judgment (**Docket #40**) is GRANTED.  A final judgment consistent with these rulings shall be entered separately.

---

[5]Brightpoint's brief in support of its summary judgment motion contains a discussion of whether a facsimile machine is a "computer" for purposes of the policy.  Indeed, it has provided the report of an expert to help convince us that a facsimile machine is a computer.  Zurich seems to raises the issue in its letter of October 16, 2003, but does not specifically defend in this case by attacking the notion of a facsimile machine as a computer.  While we need not and do not decide the question in this entry, we think the common and ordinary meaning of computer as widely used and understood in our society and around the world is severely stretched by the inclusion of a facsimile machine.

IT IS SO ORDERED.  03/10/2006


_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana




Copies to:

Daniel P. King
LOCKE REYNOLDS LLP
dking@locke.com

Hugh E. Reynolds Jr.
LOCKE REYNOLDS LLP
hreynolds@locke.com


Daniel Ryan Roy
BAKER & DANIELS
drroy@bakerd.com

Christopher G. Scanlon
BAKER & DANIELS
chris.scanlon@bakerd.com